JUDGE PRYOR
delivered the opinion oe the court.
Jeff. McGee, a free man of color, died in the city of Lexington in the year 1872, leaving surviving him his widow, Huldah, and six children, and also the appellant Mary Brown, who claims to be a child of Jeff, by his first wife. He died intestate and the owner of real estate valued at about $2,000.
In January, 1873, Mary, who had intermarried with Brown, instituted the present action in the Fayette Circuit Court to recover an undivided interest of one seventh in her father’s *430 real estate, alleging a marriage between her mother and Jeff, in accordance with the custom among slaves at that date.
Becky, the mother of Mary, was a slave at the time of her marriage, and owned by a man named Hall. The marriage took place prior to the year 1833, and Becky, the mother, died in the year 1838. After the death of her mother Jeff, purchased Mary for the sum of $400, always recognizing her as his child, and discharging the natural duty of a parent in providing her a comfortable home and looking to her welfare as long as he lived.
The fact of the marriage between Jeff, and Becky is controverted by the second wife and her children, and an attempt made to show that Becky was only the looman or mistress of Jeff., and never regarded by him as his wife. There is some conflict in the proof on this point, but the decided weight of the testimony is to the effect that they were married by Dr. Cloud, a minister (white) of the Methodist Church, and when looking to the degree of affection exhibited by Jeff, toward Mary in the discharge of what he conceived to be the natural obligation resting upon him to maintain and care for her, there can be no doubt on this branch of the controversy.
It is certain that the appellant was recognized, accepted, and raised by Jeff. McGee as his child, and that he and Becky lived together as man and wife.
It is maintained by counsel for the appellees that the second section of the act of February 14, 1866, only applies to such negroes as were at the passage of that act living in the relation of gwasi-marriage, and that the proviso legitimatizing certain children only applied to the children of those persons; that the mother of Mary having died long prior to the passage of the act of February, 1866, it has no application whatever to the rights of her offspring.
The second section of the act reads: "All negroes and mulattoes who have heretofore lived and cohabited, and do now *431 live together as husband and wife, shall be taken and held in law as legally married, and the issue held as legitimate for all purposes; provided, such persons shall appear before the clerk of the county court of their then residence and declare that they have been and desire to continue living together as husband and wife, when, upon the receipt of a fee of fifty cents, the clerk shall make a record of such declaration, and, for an additional fee of twenty-five cents, shall furnish the parties with a certificate of said declaration. Said record or certificate shall be evidence of the existence of the marriage and the legitimacy of the issue born or to be born to said parties. Provided, the issue of customary marriages of negroes shall be held legitimate.”
It was impossible for Jeff, and Becky to comply with the act of 1866. Becky died a slave in the year 1838, leaving her child Mary, who was also a slave and incapable of inheriting or owning property of any kind. Nevertheless she was the child of Jeff.; and the slaves of the country having been emancipated, the law of the 14th of February, 1866, was enacted for the purpose of making the children of those who had been slaves and married while in servitude legitimate, in order that they might inherit from their parents as well as enforce any other obligation arising by reason of the relation of parent and child.
The legislature seems to have anticipated the fact that some of the race might not be in a condition to avail themselves of the provisions of the act, and others might neglect or refuse to do so, and therefore inserted a proviso by which the issue of customary marriages of negroes were made legitimate. This proviso applies to all children the issue of customary marriages entered into between negroes prior to its passage. There is no reason why it should be made to apply alone to the children of those who were living together as man and wife at the passage of the act. Such could not have been the *432 legislative intent. The meaning of the legislature is awkwardly expressed by the language used with reference to those who are entitled to the benefits of the law, but there is no ambiguity in the language of the proviso declaring that “ the issue of customary marriages of negroes shall be held legitimate.”
One of the main objects of the act of 1866 was to make legitimate the children of slaves born before its passage, and when, by reason of their condition, the marital relation in a legal sense could not be created by any contract they might have entered into. The customary marriages among negroes were such as originated from cohabitation and the recognition of each other as man and wife. Such constituted the marital relation; and in the present case, in addition to these facts constituting at that time a marriage between slaves, there was a marriage ceremony performed by a minister of the Methodist Church.
In the cases referred to by counsel for the appellees, where a construction is attempted to be placed upon the act of February, 1866, it will be found that the controversy was between the husband and wife, in which the one or the other ivas attempting to assert their marital rights without complying or attempting to comply with any of the provisions of that act. They had neglected or were not willing to legalize their marriage, and for that reason the court said the marital relation did not exist between them; but the very terms of the act in substance say that, although the parents may refuse to legalize the marriage, if they were married prior to the passage of the act, in accordance with the custom of their race, the offspring shall be held legitimate.
In the case of Whitesides v. Allen (11 Bush, 23) it was held that the children were legitimate, although the parents, who were both living at the passage of the act, had failed to take the necessary steps to legalize their marriage. Although the *433 facts in this case are different, the same rule, for the reasons already stated, should apply.
The constitutionality of the proviso to the act upon which the rights of the appellant are made to depend is questioned by counsel. This act was intended to regulate and legalize the marriage relation that at the time existed between persons of the entire colored race within the state, and to make legitimate the offspring of customary marriages between such persons entered into prior to that time.
Many of the rights of property, as well as the domestic and social relations of this class of citizens, are made to depend upon the validity of this provision; and in view of the injurious consequences resulting from a disregard of this part of the act, and the fact that both the legislative and executive departments of the state must have considered the constitutional question involved, even conceding it to be one of doubt, under a well-recognized rule of construction this court can not hold the proviso to the act unconstitutional. The act is entitled “An act in relation to the marriage of negroes and mulattoes,” and announces by the proviso, as one of the rights resulting from the marriage relation, that the issue of such marriage shall be held legitimate; nor was it necessary on the part of the law-making power to consult first the wishes of the parent before making the child capable of inheriting his estate.
The legislature has the undoubted right to regulate the course of descent, and by making the issue of customary marriages legitimate, the right to inherit the parent’s estate (he having died intestate) necessarily follows.
This is a humane and beneficent statute, and should not be rendered nugatory by mere technical construction; and when considering the intention of the legislature and the object in view in enacting the statute, as well as the language used, we are satisfied it applies to all children the offspring of such eus *434 tom ary marriages where the marriage relation existed prior to the passage of the law.
The appellant Mary Brown was entitled to an equal interest with the other children in the estate left by the father. The judgment is reversed, and cause remanded for further proceedings consistent with this opinion.