## Cabble v. Hawkins, et al.

(Decided December 2, 1919.)

### Appeal from Daviess Circuit Court.

1. Slaves—Presumption in Favor of Legitimacy of Children.—Every presumption is in favor of the legitimacy of children born while parents lived together as husband and wife, whether under a legal ceremony or by custom.
2. Slaves—Inheritance From or Through Slaves.—Children born during slave time to negro parents who lived together as husband and wife, and who recognized each other as such and were recognized by those with whom they associated as husband and wife, are legitimate and entitled to inherit from the father even though the marriage was not publicly celebrated as now required by law.
3. Bastards—Legitimacy—Appeal and Error.—Where the weight of the evidence tends to establish the legitimacy of a child, a judgment of the chancellor holding him illegitimate will be set aside.

R. W. SLACK and LITTLE & SLACK for appellant.

W. T. ELLIS and J. H. PAYNE for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

An old negro named Thurston Cabble died testate in Owensboro in 1905, leaving a small lot and house in that city which he devised for life to his wife, Joanna, with remainder to his son John. The boy died before his father, but the widow survived the old man. He had been married several times, twice according to the custom of negro slaves previous to the civil war. He left no child or descendant unless the appellant, Herbert Rouse Cabble, is his grandson, which is disputed. Neither had he other kin, and his wife, Joanna, under our statutes, section 1393, was entitled to inherit his real estate. The appellant is a young negro, the son of Ned Rouse, and Ned Rouse, now dead, is claimed to have been the son of old Thurston by a negro slave named Jennie. As there are no authentic records of negro marriages previous to February, 1866, when the enabling act was passed by our legislature, giving to negroes who were living together as husband and wife and who intended to so continue, the right to go before the clerk of the county court and declare such intention and have the same noted of record, and thus legitimatize the issue of such customary marriage, we must look to the testimony of persons who were acquainted with Thurston and Jennie while they were slaves to determine whether they were husband and wife, according to the manner of slaves in those days, and as such the father and mother of Ned who was the father of appellant Herbert. On this question Mary Payne and Nancy Bibbs, two old colored women, testified relating facts which incline us to the opinion that Ned was not only the offspring of Thurston, but the result of his marriage with Jennie. Mary Payne says:

"I am sixty-seven. Q. Where do you live? A. In the city of Henderson, Ky. . . . Q. Did you know Thurston Cabble who died in Owensboro in 1905? A. Yes, sir. Q. How long did you know him? A. Been knowing him ever since in slave time. Q. When you first knew him in slave time, by what name did he go? A. Thurston Barrett. He belonged to Alex Barrett. . . . Q. Did he marry during slave time? A. Yes, sir. Q. About what time did he marry? A. He married just about a year before the war. Q. Before the beginning of the war or the end of the war? A. Before the end of the war. Q.

Did he marry before the war commenced? A. He was married to my mother before he went to the war. . . . Q. Was the war over before he returned? A. Yes, sir. Q. You say he was married to your mother, what was her name? A. Jennie Rouse. . . . Q. Who married her? A. Mr. Albert Weaver. Q. What was he? A. Methodist preacher. Q. White or colored? A. White man. Q. Whose house? A. Paul Cinnamond. Q. Where was he married, city of Henderson? A. Upper Main street. . . . Q. How old were you at the time your mother married Thurston? A. I guess I was between twenty— I was over fifteen, near twenty. Q. Did they have any children by that marriage? A. Thurston—Ned afterwards. Q. Ned who? A. Ned Rouse Cabble. Q. What name did Ned usually go by? A. Rouse—Ned Rouse. . . . Q. How long was it after they were married before Ned was born? A. He was born while he (Thurston) was gone to war. She could not stand it alone and he came back. Q. Was Thurston re-married to your mother after the war? A. Yes, sir. Q. How long after the war was it he re-married your mother? A. After licenses was granted that the colored people should marry like white folks. . . . Q. Where were they married the second time? A. On the upper part of Main street on the place they call Brummett's hill. Q. Whose house? A. Nancy Bibbs. Q. Who is Nancy Bibbs? A. That lady over there. Q. Is she related to your mother? A. She is my mother's sister. Q. Who performed the marriage ceremony at that time? A. Preacher Anthony Bunch. Q. Was he colored or white man? A. Colored man. . . . Q. Now after Thurston married the second time, did he have any children by your mother? A. No, sir, excepting four.''

She then says all four of the children of Thurston and Jennie are dead, leaving no descendants except appellant who is the son of Ned; that all of the children of Thurston died before he died. She also testifies that Thurston Cabble always recognized Ned as his son and provided for him as a father would for a child, for a number of years.

Nancy Bibbs testified that she lived in Henderson; that she does not know her age but that she was born many years before the civil war and was a slave; she says she knew Thurston Cabble. She was asked:

"Q. Did you know of his having 'been married to Jennie Rouse? A. Yes, sir; he was married right in my room. Q. Is she any kin to you? A. Yes, sir. Q. When was it he was married to Jennie Rouse in your room? A. After the war. Q. Where did he live? A. On Brummett's hill. Q. In the city of Henderson? A. Yes, sir. Q. How many children did Thurston and Jennie have? A. Ned, Robert, Mattie and an infant baby. . . . Q. Who was the minister that married them in your house? A. Anthony Bunch.''

She then names the witnesses who were present at the wedding and says that all persons present at the wedding are dead except she and Mary Payne. Further testifying she says Ned, the son of Thurston, was married to Miss Tyson, and that the appellant Herbert is the only child of Ned.

An old gentleman named John Matthews, who had superintended a great deal of public work in the years gone by and had employed Thurston for many years, testifies in substance that Ned was the son of Thurston and Jennie under a customary slave marriage, and that Thurston recognized Ned as his son. Several other persons give evidence to the effect that Thurston recognized Ned as his son.

On the other side, a very old colored man named Nicholas Barrett testifies that he and Thurston were fellow slaves on the same farm for some years before the war, and that he was a chum and associate of Thurston, and that Thurston was married to a woman named Lydia Jordan, with whom he lived up to the time he went to the army in 1864, which, if true, proves that Thurston was not wedded to Jennie the mother of Ned until some time after the war and that Ned was not the child of Thurston. This old colored man was asked:

"Q. Did he (Thurston) live on the same farm you lived on? A. Yes, sir; on the same farm, up here above town (Henderson). Q. Did you know anything of him living with a negro woman by the name of Lydia Jordan? A. Yes, sir; that was his first wife. Q. Do you know about when he lived with her? A. He lived with her before he went to the army. Q. Did he live with aunt Lydia up to the time he joined the Yankee army? A. Yes, sir. Q. Did they have any children, Lydia and Thurston Cabble? A. Had three. . . . Q. Now, I believe you

have stated they lived together up to the time Thurston went to the army? A. Yes, sir. Q. Did you know a negro who lived here until she died by the name of Jennie Rouse? A. Yes, sir. Q. Did you know of any children she had? A. Yes, sir. Q. Did she have two children, one by the name of Ned Rouse? A. Yes, sir. Q. And the other two by the name of Robert Cabble and Mattie? A. Yes, sir; Thurston's. Q. You mean these last two were Thurston's children? A. Yes, sir. Q. That is, Robert and Mattie Cabble? A. Yes, sir. Q. Then Ned is not the son of Thurston Cabble A. No, sir. . . . Q. When was Ned Rouse born? A. I cannot tell you when he was born. I knew his father and mother but do not know when he was born. Q. Was he born before the civil war or after that war? A. He was born before the war. . . . Q. How do you know what time he was born? How did you get your information? A. Thurston married his mother after freedom, after he came home out of the army Q. Whose mother? A. Ned's mother. . . . Q. Did you see him when he was married? A. Yes, sir. Q. To Jennie Rouse you mean? A. Yes, sir. Q. Was that right after the civil war. A. Yes, sir. Q. How old was Ned then? A. I could not tell you how old he was. I did not keep any record. Q. Was he a little boy? A. I was up above town on the Brummett farm; I used to see Jennie carrying him around. Q. You do not know anything about whether he was living with Jennie immediately before he went to the army? A. No, sir; I don't think he was living with Jennie when he went to the army; he did not marry Jennie until after he came back. Q. I am not asking about marrying her? A. He did not live with Jennie. Q. How could you tell anything about it if you were living in the country and Thurston in the city? A. We used to meet each other. . . . Q. Had Ned been born at the time Thurston went to the army, or was he born afterwards, or do you know when he was born? A. He was born before Thurston married Jennie, you know. Q. Before Thurston married Jennie? A. Yes, sir. Q. Do you know how long before Thurston married Jennie? A. No, sir; I do not know, I could not tell you. Q. Was he not a baby at the time Thurston married Jennie? A. I am not certain about it, but I think he was a good size boy when Thurston married Jennie.''

This witness, as well as several others who testified, is quite certain that Ned is not the son of Thurston and stated that Thurston did not recognize Ned as his son but declared he was not his son.

The evidence given by Mary Payne and Nancy Bibbs is of an affirmative nature, direct and positive, while that of the old colored man Nicholas Barrett is largely negative in its nature, rather indefinite and uncertain. Affirmative evidence is entitled to greater consideration than negative, everything else being equal; and applying this rule to the evidence offered in this case, we have little trouble in concluding that the decided weight of the evidence is with the appellant against whom the chancellor found the facts. Without doubt, the weight of the evidence supports the contention that Ned was the son of Thurston and Jennie, born after they had entered into a customary marriage and were living together as husband and wife. After they had so lived for some years and had three or more children, they again appeared before a minister of the Gospel who for the second time solemnized the rites of matrimony between them. There is some evidence that they were awarded a marriage certificate but this paper does not appear in the record. However, this was not necessary in order to legitimatize the offspring of that marriage. A customary marriage among slaves was recognized by both white and black when a man and woman lived together as husband and wife, recognized each other as such and were so recognized and acknowledged by people who lived in the same neighborhood even though the rites of matrimony were not publicly celebrated. In the case of Scott v. Lairamore, 32 S. W. 172, we said: "Where a man and woman while slaves live together as husband and wife, and at the time recognize each other as husband and wife, a customary marriage was thereby established." Since Ned was born to Thurston and Jennie after they had been living together as husband and wife, recognizing each other as such and being so recognized by their associates, they were married according to the custom of the times among the negroes, and such marriages have been often recognized and upheld by this court. Ned was the legitimate son of Thurston and entitled to inherit from him. It, therefore, follows that Herbert, the son of Ned, being the only lineal descendant of Thurston, is entitled

to inherit the property of his grandfather Thurston. The trial court erred to the prejudice of appellant in holding otherwise, and the judgment is therefore reversed with directions to enter a judgment in conformity with this opinion.

Judgment reversed.