# CHARLESTON.

GOLDSMITH *et ux.* *v.* GOLDSMITH.

Submitted January 30, 1899—Decided April 15, 1899.

1. DEED—*Construction—Repugnant Clauses*
    Repugnant words must yield to the purpose of the grant, where such purpose is clearly ascertained from the premises of the deed, though such words stand first in the grant.   (p. 428).

2. DEED—*Maintenance.*
    A deed made in consideration of maintenance, where there has been a failure to furnish maintenance, will be set aside,— more especially where it has a clause of forfeiture for such failure.   (p. 431).

3. DEED—*Cancellation—Fraudulent—Conveyance.*
    To defeat a grantor in the cancellation of a deed because it was made with intent to defraud creditors, there must be a liability chargeable to the grantor at its date.   (p 431).

4. DEPOSITIONS—*Equity Pleading—Objection.*
    Depositions proving a matter not in the pleadings when taken cannot be read to support an answer afterwards filed, setting such matter up, if objected to.   (p. 432).

5. EQUITY PLEADING—*Answer—Negligence.*
    An amended answer should not be allowed, raising new issues, where it appears the party knew the facts when he filed his first answer, and is thus guilty of negligence.   (p. 433).

Appeal from Circuit Court, Harrison County.

Suit by Jacob Goldsmith and wife against Grant Goldsmith.   Decree for plaintiffs, and defendant appeals.

*Affirmed.*

JOHN BASSEL, for appellant.

LEWIS C. LAWSON, for appellees.

BRANNON, JUDGE:

This is a chancery case in the circuit court of Harrison, brought by Jacob Goldsmith and wife against Grant Goldsmith to cancel a deed resulting in a decree of cancellation, and an appeal by Grant Goldsmith.

By a deed bearing the date of 15th October, 1885 Jacob Goldsmith and wife conveyed to Grant Goldsmith a tract of forty-six acres of land in consideration of maintenance; and the plainiffs brought their suit in September, 1897, for its cancelation on the claim that such maintenance had not been furnished them. The counsel for defendant contends that even if defendant did not furnish his father and mother a full and sufficient support, but from limited means was unable to do so, and did anything towards it, "to the best of his ability," or perhaps nothing, that satisfies the call of the deed, and it cannot be canceled. We would say at once without analysis of the deed, that it is wholly unlikely that a man of seventy years, and his wife, a few years younger, would convey their little home, all they had for roof or bread, to obtain their support, and make it entirely dependent on the changing pecuniary ability of the grantee. Let us see if these old people, though unlettered and unskilled in writing papers, have committed this blunder or whether the draftsman has made their deed do what they could not have meant to do. The deed reads thus: "Witnesseth, that Jacob Goldsmith and Susanah Goldsmith, for the sum of one dollar to them in hand paid by second party, the receipt whereof is hereby acknowledged, and for their lifetime maintenance, doth grant unto second party, with covenants of general warranty, all of a certain piece or parcel of land situate * * *. The conditions of this deed are such that whereas, the above-named party of the second part has agreed to furnish his father and mother, parties first above, a comfortable maintenance during the remainder of their natural lives, and should the second party fail so to do, from any cause, then the land herein conveyed shall revert to any son or daughter of first parties, to be chosen by first parties if both are then living; if not both living then the one living to make the choice. But so long as second party is living, and endeavoring to perform his part of the stipulations herein named, (he) the said second party is not to be molested or

dispossessed, but shall have and hold the above-named real estate free from any and all incumbrances, together with all its appurtenances belonging." How can it be said that this does not provide for the full and adequate support of the grantors? The words are ample to do so and of the intent there is no doubt. So specific was the intent to guarantee a support that the deed declares a forfeiture on its failure. But the word "endeavor" is the sole basis of the position of counsel. It is said to mean "to use efforts," "to attempt," "to try," "to strive," and so on. Generally it means that, but that depends on the place, context and circumstances under which it is found. Shall we use it to destroy the prime intent of the grantors so plainly twice declared, and take from them the bread of life, or reduce it to a small, dry crust? Would that be a fair or just construction? The law is that a clause first in order in a deed shall stand, and a later repugnant clause fail. If necessary to give meaning to the word "endeavor," as used in this deed, I should say it was used to emphasize the duty already put on the defendant,—to call upon him to fulfill, and demand full compliance, and not to destroy, lessen, and fritter away the main purpose of the deed on the grantor's part. We must give it, if possible, a construction to comport with that main object, and we can do this, but, if we could not, we would eliminate it. "Repugnant words must yield to the purpose of the grant, where such purpose is clearly ascertained from the premises of the deed, though such words stand first in the grant." *Flagg* v. *Eames*, 94 Am. Dec. 363.

Now as to the merits: It was the conviction that defendant had not furnished his father and mother the support required by them that impelled his counsel to use the word "endeavor" as stated above. On some evidence to show that defendant had furnished some coal and some other inconsiderable help, and upon the admission that the defendant was poor, without property, dependent upon day labor as a coal miner, counsel argue that this met the demand of the deed, in view of that word "endeavor." Taken at the most, giving to the defendant's evidence its fair weight, he furnished but a poor fraction of support for these aged people, unless we take his broad statement that he did, which is without specification. Save his own evidence, there is

little or no evidence to show any compliance with his obligations under the deed. Nine witnesses show, clearly, fully, overwhelmingly, the utter failure of the defendant to support his father and mother; and he is virtually the only witness to the contrary, as other evidence only tends to show some coal, a pair of pants, a cheap suit, and some other trivial articles, at different times during years, falling absolutely short of a support, nothing approximating it. This defendant was about twenty-one when the deed was made. Instead of staying at home and working the farm for the support of his parents, he roamed here and there over the country, went to Ohio for a year, went to Monongah and to Tucker County, and other points, working in coal mines, and even calling on his mother for money while in Tucker, remaining long away, in fact, all the time, and then married and lived with his family elsewhere. He was addicted to drink. Fortunately, a daughter of the old man, Sarah, and two young grandchildren, Edward and Mandana Goldsmith, lived with him and took care of the old people, Edward Goldsmith, though a boy, working the little farm; and the evidence shows that but for them the old people could not have subsisted. He says he paid the doctor's bill, but the doctor and receipts show that he paid twenty dollars, and the father the rest. He did not pay taxes on the land, though he so claimed; for his mother produced receipts for taxes, even on his own head for years 1886 and 1896. He wrote letters from Tucker County in January, 1893 asking (I should say, imploring) his mother to send him thirty dollars to buy out a man who, he said, had everything necessary for him (the defendant) to go to housekeeping on. The mother sent the money. Again he wrote his father and mother, and in a postscript said, "So sarah you can send me some goosery and i can use them and all the molasses to i will take every thing you gave me and be glad to get it for i am very hungry now." In another letter to his sister, January, 1893, he wrote and asked some one ("Kit") to send a balance, whatever she thought right, "i bound to have the money to go to housekeeping," and said, "i dont know weather i ever come home eny more." This is indubitable evidence that six years after the deed he was unable to support himself, much more, his parents, and he was utterly "poverty-stricken. He want-

ed to take, did take, from the mouths of the old people, gooseberries and molasses, and other things produced by the children, to support himself. He complains that his sister and niece and nephew were on the farm. Why was he not there to do what they did? The evidence shows not merely failure to support his parents, but absolute refusal. Evidence shows that frequently, when called upon for aid, he angrily declared that he did not intend to afford help, as he had all he could do to care for himself and family.

It is said the witnesses for plaintiffs are only themselves and children and grandchildren, and they are perjured. Whom has the defendant to sustain his plea of compliance with the deed, but himself? From all that appears, they are more worthy of credit than he, if we must talk of perjury. Evidence shows their good reputation. There are eight of the family proving that no support—none at all—was given. Who would know better than they? But in fact a witness (Stutter), not a relative, living within two hundred yards of these old people, who appears cautious as a witness, fully proves want of support, and states that but for the daughter and grandchildren, these old people could not have lived. The preponderance of evidence on the side of the plaintiffs is very decided. The evidence is conflicting. The circuit judge has found for the plaintiffs, and we cannot overrule him without violating precedent and justice. He could not have decided otherwise. He could not, we cannot, stamp perjury on nine witnesses, at the bidding of one, whose interest towards falsehood is greater than theirs. This son manifested no affection for his parents, abandoning them as he did in their old days. When at their home when their depositions were to be taken, after he and the others that were strangers had eaten at the first table, and his parents and sister had sat down to their dinner he returned to the kitchen where they were, and raised a quarrel with them, and when the daughter remonstrated and told him he would get into trouble he said, "I don't give a God damn," and called his father a "God-damned liar," and said, "Now come and go into the other room and swear a God-damned lie," and waved his fist over his head and was going to strike him, when the daughter intervened and took the blow herself. The excitement disabled the old people from giving evidence

that day. This abuse of the father is shown by several witnesses, and not at all denied by defendant. The daughter swears that before this he would come home drunk and quarrel with his parents. The old people were both sick nigh unto death for two winters before,—the old man (80 years) confined to his bed, afflcted with cancer, both utterly helpless, and yet no succor came to them from Grant Goldsmith. I know that this abuse is not so material, but it seems to me to show a want of love which should induce a son to help his aged parents, outside of any reward, and corroborates the claim of the parents that he not only failed, but refused, to lend them a helping hand. The plaintiffs waited struggling on as best they could, for twelve years before bringing this suit, hoping that the wayward son might change for the better for them and him; but the hope proved vain. If he is allowed to retain this little farm, capable of poor support at best, where is the guaranty of these aged people for bread and raiment, even burial clothes, except from the county of Harrison? The demand of these plaintiffs bears in every respect a hue of merit, and is sustaind by evidence and law. In a similar case we canceled a deed for failure to furnish maintenance to aged parents. *Wilfong* v. *Johnson,* 41 W. Va. 283, (23 S. E. 730.) There was no forfeiture clause in that deed, but cancelation was granted for total failure of the consideration moving the conveyance. If there were no such clause in this deed, the decree of the circuit court would be justified by general principles of equity; but here the court had such a clause, and only enforced it.

Another defense is that this deed was made to defeat a liability for costs in a contest concerning the will of the father of Goldsmith's wife, and that, therefore, the plaintiff cannot sustain a suit in equity to cancel a deed made to defraud creditors as the law is that, though both grantors and grantee are equally guilty, yet equity will take no step to help either, but leave them where they placed themselves, under the maxim. *"In pari delicio potior est conditio defendentis."* *Horn* v. *Foundry Co*, 23 W. Va. 522; *Cain* v. *Cox, Id.* 594; *McClintock* v. *Loisseau,* 31 W. Va. 865 (8 S. E. 612); *Stout* v. *Mercantile Co.,* 41 W. Va. 339, (23 S. E. 571). This doctrine cannot apply in this case: First. Because the liability against which, it is alleged, the deed was intended to provide, was not against Jacob Goldsmith,

—only against his wife. To say that a deed is made to defraud creditors, there must be a liability chargable on the land. Bump, Fraud. Conv. section 501. Cain v. Cox, 23 W. Va. 606. Second. The evidence to sustain this charge is light and insufficient. The strongest is that Jacob Goldsmith had the deed antedated,—just why, does not clearly appear. He dated it December 14th, and the recovery of costs against his wife was on the 11th. Why did he not date it back of the 11th, if he designed to meet that? And, as the deed reserved support, the land was still liable, if it had been at all. Third. The oral evidence, consisting of a stray expression of a witness or two, and the evidence of defendant, contradicted by plaintiffs, cannot be read to prove this defense, because it comes for the first time in an amended answer. The affidavit of the clerk shows that all the evidence had been filed long before this answer. We know this, too, because the answer was filed the 20th, and the decree was the 29th, and it is not likely that evidence was taken in the few days' interim. So there were no pleadings setting up this matter when that evidence was taken, and it cannot be read. "Where fraud is not put in issue by the pleadings, it cannot be introduced by depositions." *Knibe's Ex'r* v. *Dixon's Ex'r*, 1 Rand. 249. "Depositions cannot be read unless taken in reference to an issue made up at the time they are taken." *Morrow* v. *Hatfield*, 6 Humph. 108. See *Jones* v. *Williams*, 1 Wash. (Va.) 230; Story, Eq. Pl. sections 28,257. This answer was excepted to, but the exception was overruled. Counsel for plaintiffs insists that, as the first answer admitted the consideration for the deed to be maintenance, the amended answer could not set up fraud, because inconsistent with the first answer. I do not realize this. An answer may set up several distinct defenses. I see no inconsistency. True, one answer said the deed was valid, the other, that it was made for fraudulent purposes. If so, it was a valid deed to defendant. But I think the court erred in allowing this amended answer just at the hearing. The first one was filed October, 1897; the amended, September 20, 1898. The attorney's affidavit states that he did not sooner know of the fraudulent purpose of the deed. But how as to defendant? He was a party to it. He had known it for twelve years. Wolverton's and Sut-

tle's depositions had been taken. In *Foutty* v. *Poer*, 35 W. Va. 70, (12 S. E. 1096), and other cases, it is held that an amended answer should not be allowed, unless cogent reasons are shown, and that the party desiring to add new facts has not been guilty of negligence, and that such facts have come to his knowledge since the original answer was filed. So I conclude that neither the amended answer not the inadequate and unsatisfactory evidence to support it can be considered. Decree affirmed.

*Affirmed.*